JUDGE FORREST

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- x

STARWOOD HOTELS & RESORTS           :
WORLDWIDE, INC., STARWOOD (M)
INTERNATIONAL, INC., and PREFERRED  :   Civil Action No.
GUEST, INC.
                    Plaintiff,       :
                                         COMPLAINT AND
        - against -                  :   JURY DEMAND

PM HOTEL ASSOCIATES, L.P. and PARKER :
PALM SPRINGS LLC,                    :

                    Defendants.
-------------------------------------------------- x

13 CIV 38
FILE COPY

RECEIVED JAN 02 2013 D.C. S.D.N.Y. CASHIERS

   Plaintiffs Starwood Hotels & Resorts Worldwide, Inc. ("Starwood Hotels"), Starwood (M) International, Inc. ("Starwood International"), and Preferred Guest, Inc. ("PGI") (collectively, "Starwood" or "Plaintiffs"), by their attorneys, Bryan Cave LLP, as and for their complaint against defendants PM Hotel Associates, L.P. ("Parker NY") and Parker Palm Springs LLC ("Parker Palm Springs"), (collectively "Parker" or "Defendants"), allege upon information and belief, except where specifically related to Starwood's actions:

## INTRODUCTION

   1.   This is an action against Parker to terminate the license agreements for the operation of two Le Méridien hotels and for damages based on Parker's multi-year scheme to fraudulently obtain over $1 million in unearned reimbursements from the Starwood Preferred Guest customer loyalty program ("SPG Program").

   2.   Parker owns and operates two hotels, Le Parker Méridien New York and Le Parker Méridien Palm Springs, as part of an extensive portfolio of properties developed by The Jack Parker Corporation. These two hotels are operated under Starwood's premier,

internationally renowned Le Méridien brand, which Starwood licenses to Parker and other hotel owners. After choosing to participate in the SPG Program, Parker fraudulently manipulated bookings at its two hotels to create the appearance of hotel occupancy rates of 95% or above when actual occupancy rates were lower. This fraud enabled Parker to receive significantly higher reimbursement payments from Starwood than what it should have received under the SPG Program based on the hotels' actual occupancy rates.

3. For more than three years, numerous Parker employees, at the direction of Parker's executive management, falsified records and fabricated room reservations for fictitious guests for the express purpose of duping Starwood into making inflated SPG reimbursement payments. Indeed, Parker would likely still be stealing from Starwood had not its own former employees reported, and a former senior manager confessed, the wrongdoing to Starwood.

4. In this action, Starwood seeks, among other things, a declaration that an incurable material default has occurred under the relevant license agreements between Parker and Starwood, a declaration that Starwood has the right to terminate such agreements, and damages

## JURISDICTION AND VENUE

5. Starwood Hotels is a Maryland corporation with its principal place of business located in Stamford, Connecticut.

6. Starwood International is a Delaware corporation with its principal place of business located in Stamford, Connecticut.

7. PGI is a Delaware corporation with its principal place of business located in Stamford, Connecticut.

8. Parker NY is a limited partnership organized under the laws of the State of New York.

9. Parker Palm Springs is a limited liability company organized under the laws of the State of California.

10. No partner of Parker NY is a citizen of Delaware or Connecticut.

11. No member of Parker Palm Springs is a citizen of Delaware or Connecticut.

12. This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a), based on the complete diversity of the parties and an amount in controversy in excess of $75,000, exclusive of interest and costs.

13. Venue is proper in this District under 28 U.S.C. § 1391 because, among other things, a substantial part of the events or omissions giving rise to the claim occurred in this District.

14. Both Parker NY and Parker Palm Springs are subject to the jurisdiction of the Court based on, among other things, the transaction of business in New York, and the commission of tortious acts and breaches of contract within New York.

## GENERAL ALLEGATIONS

15. Parker owns and operates the two Le Parker Méridien hotels under Starwood's premier, internationally-renowned Le Méridien brand, which Starwood licenses to hotel owners such as Parker.

16. Parker NY is the owner of the Le Parker Méridien New York hotel, located at 109-123 West 56th Street, New York, New York ("NY Hotel").

17. Parker Palm Springs is the owner of the Le Parker Méridien Palm Springs hotel, located at 4200 East Palm Canyon Drive, Palm Springs, California ("Palm Springs Hotel").

18. The NY Hotel and the Palm Springs Hotel (collectively, the "Parker Hotels") are luxury hotels with over 700 and 140 rooms, respectively.

19.     Starwood International and PGI are affiliates and subsidiaries of Starwood Hotels.

20.     Starwood Hotels, directly and through its affiliates such as Starwood International, owns, manages and franchises hundreds of hotels under various brands such as St. Regis, The Luxury Collection, W, Westin, Le Méridien, Sheraton, Four Points, Aloft, and Element.

21.     One of the core businesses of Starwood Hotels and its affiliates, such as Starwood International, is the licensing of brands to unaffiliated owners or franchisees. In its franchise business, Starwood Hotels and its affiliates license the right to use their various trade names and trademarks to third party hotel owners in exchange for certain fees. Starwood Hotels and its affiliates do not operate or manage such franchised hotels. Rather, the independent hotel owner or manager is responsible for all operational activities.

### *The License Agreements*

22.     On or about July 31, 1996, PM Associates, the predecessor to Parker NY and Meridien Hotels, Inc. ("Meridien"), entered into a Le Méridien license agreement for the NY Hotel, which was subsequently amended by a Letter Agreement, dated May 19, 2003, and extended and modified by an Extension and Modification Agreement, dated May 2003 (collectively, the "NY Agreement").

23.     Parker NY is the successor to PM Associates under the NY Agreement.

24.     On or about May 28, 2003, Parker Palm Springs and Meridien entered into a Le Méridien license agreement for the Palm Springs Hotel (the "Palm Springs Agreement").

25.     In or about November 2006, Starwood International succeeded to Meridien's interests under the NY Agreement and the Palm Springs Agreement (collectively, the "License Agreements").

4

26. Pursuant to the License Agreements, Starwood International granted Parker NY and Parker Palm Springs the right to operate the Parker Hotels using the Le Méridien trade name and trademarks, and Starwood International agreed to market and promote the Parker Hotels by, among other things, integrating the Parker Hotels into Starwood's reservation systems.

### *The SPG Program*

27. When the economy began to deteriorate in the fall of 2008, the Parker Hotels joined the SPG Program hoping to bolster the hotels' revenue by participating in the program.

28. By amendments dated October 28, 2008, the parties amended the License Agreements, and pursuant to such amended License Agreements, the Parker Hotels began to participate in the SPG Program.

29. The SPG Program is Starwood hotels' frequent guest program, which allows members to redeem points that they have earned ("Starpoints") from stays at hotels participating in the SPG Program and other actions for complimentary stays at those hotels.

30. When a member redeems Starpoints for a complimentary stay at a participating hotel, the SPG Program reimburses the hotel at a rate that depends on the occupancy rate for the hotel on the night of the guest's complimentary stay.

31. Specifically, when the occupancy rate of the participating hotel is 95% or above, reimbursement is at the average daily room rate ("ADR") for the hotel on that night. When the occupancy rate of the participating hotel is lower than 95%, reimbursement is at a flat rate that is typically much lower than the ADR. The difference in the two reimbursement rates is often more than $200.00 for each SPG room.

32. Hotels participating in the SPG Program benefit from their participation in the program. SPG drives the most loyal Starwood guests to stay at the participating hotels. These

SPG members, who tend to be higher value customers, receive Starpoints for their stays that can be redeemed for hotel stays and other member benefits. SPG also drives members to redeem Starpoints to stay at participating hotels, which results in occupancy of rooms that might otherwise go empty.

33. PGI sells Starpoints to SPG participating hotels and partners, redeems Starpoints for cash (including Starpoints received from SPG participating hotels), and administers the SPG Program. Starwood Hotels promotes the SPG program by, among other things, creating and launching marketing campaigns, as well as by developing and maintaining the SPG Program website.

### *The Fraudulent Scheme*

34. Parker was not content to legitimately earn revenue through its hotels' participation in the SPG Program. Instead, Parker implemented a broad ranging scheme to create false reservation and occupancy records at both the NY Hotel and the Palm Springs Hotel to fraudulently inflate occupancy rates to 95% or greater. Parker did so to improperly obtain significantly increased reimbursement payments from Starwood under the SPG Program.

35. Parker's fraudulent scheme started at the NY Hotel in 2008 or 2009.

36. Steven Pipes, a Senior Executive of Parker and the Jack Park Corporation, directed the NY Hotel's most senior management in implementing the scheme.

37. After the Parker Hotels joined the SPG Program, Pipes became very focused on making sure the NY Hotel hit the 95% occupancy threshold so Parker NY could maximize its reimbursement payments from the SPG Program.

38. Pipes discussed the need to hit the 95% occupancy threshold with many of the hotel's senior management at weekly revenue meetings.

6

39. Not satisfied with trying to reach the 95% occupancy rate by using legitimate business practices such as advertising and promotions, Parker fabricated hundreds of false reservations with fictitious names and faked checking-in those "fictitious guests" in the NY Hotel's reservation system to fraudulently misrepresent that the NY Hotel had achieved the 95% occupancy threshold.

40. In other words, at Pipe's direction, employees and managers at the NY Hotel fabricated reservations and guest check-ins.

41. At Pipes' direction, Parker NY's fraudulent scheme was broadly carried out, implicating many of the NY Hotel's senior staff.

42. The NY Hotel's general manager, the front desk manager, the overnight manager, and the revenue manager participated in the fraudulent scheme.

43. Parker NY primarily inflated the NY Hotel's occupancy rate by booking fake "familiarization trips" ("Fam Trips"), which are complimentary stays typically offered by hotels to travel agents or agencies with the ultimate goal of encouraging them to book future customers into the hotel after gaining a positive impression of the hotel from their complimentary stay.

44. Parker NY usually booked legitimate Fam Trips at the NY Hotel only in low season so as not to displace paying business, and rarely, if ever, booked them when it expected occupancy to be near or above 95%.

45. While Parker NY annually booked very few real Fam Trips at the NY Hotel, it booked false reservations for and checked-in hundreds of fake Fam Trips to hit the 95% occupancy threshold.

7

46. Over several years, Parker NY also fraudulently inflated occupancy by falsely checking-in guests into the NY Hotel who had made real reservations, but never actually showed up or stayed at the NY Hotel on the reserved night ("No-Shows").

47. To avoid any collateral expense to itself associated with its scheme to defraud Starwood and the SPG Program, Parker NY directed the NY Hotel's night or day managers to check out the fake checked-in rooms in the early morning hours, before those rooms would be listed as needing to be cleaned by the housekeeping staff. In that way, Parker NY avoided imposing on itself housekeeping expenses for the rooms it had fraudulently mislabeled as occupied.

48. Using the false check-in data it created in the NY Hotel's reservation system, Parker NY then created and submitted to Starwood false SPG reimbursement requests.

49. In particular, for each night that Parker NY claimed that the NY Hotel's occupancy was at or above 95%, Parker NY's management prepared a worksheet (the "ADR Worksheet"), which included, among other things, the total number of rooms that it claimed were occupied in the hotel, the number of complimentary rooms, the number of SPG rooms, the ADR to be used for calculation of the SPG reimbursement, and the percentage of occupancy for the hotel for that night.

50. For each night that Parker NY claimed occupancy was at or above 95%, it also prepared a report known as the "Manager's Flash Report," which included, among other things, the supposed back-up information supporting the ADR Worksheet.

51. Parker NY then faxed the ADR Worksheet and the Manager's Flash Report to Starwood Hotels' SPG reimbursement team located in Ontario, Canada.

NY02DOCS\1667347.17\C062189\0328633

52.     Starwood Hotels and Starwood International, in reliance on fraudulent data and reimbursement requests by the Parker NY, then caused PGI to pay or credit Parker NY hundreds of thousands of dollars, if not more, to which Parker NY was not entitled.

53.     To conceal the fraudulent scheme, Pipes instructed the NY Hotel staff not to refer to the scheme in any emails.

54.     Pipes also instructed hotel employees to delete any emails that referred to the scheme.

55.     When the scheme proved lucrative in New York, Pipes expanded it to the Palm Springs Hotel.

56.     Pipes, also a senior executive at Parker Palm Springs, directed numerous Parker Palm Springs employees, including the hotel's managers and front-line employees, to participate in the fraudulent scheme.

57.     While Pipes generally was not on-site at the Palm Springs Hotel, he regularly oversaw its management from the NY Hotel. Pipes held regular telephone conferences with on-site hotel management and traveled to the Palm Springs Hotel several times a year to more directly oversee its management and operation.

58.     After the Palm Springs Hotel began participating in the SPG Program, Pipes instructed the hotel's management of the importance and need to meet or exceed the 95% occupancy threshold in order to achieve the highest reimbursement possible from the SPG Program.

59.     Pipes subsequently directed the Palm Springs Hotel staff to implement a scheme to fraudulently inflate the hotel's occupancy rate to 95% or above, resulting in the SPG Program's paying a substantially increased reimbursement to Parker Palm Springs.

60. Parker Palm Springs inflated the hotel's occupancy rate primarily by improperly including in its occupancy calculation "House Rooms," "No-Shows" and fake complimentary rooms.

61. House Rooms are a type of complimentary room provided at no charge to hotel employees who need to stay at the hotel overnight.

62. Pipes controlled whether to approve such no-cost stays.

63. To implement the scheme using these types of room reservations, either a front desk employee acting at Pipes' direction or Pipes, who had access to the reservation system for the Palm Springs Hotel, would enter these reservations into the hotel's reservations system.

64. Pipes had a standing directive to the Palm Springs Hotel manager, front office manager, and overnight manager to then review the daily occupancy rate at the end of each the day. If the occupancy rate was close to the 95% threshold, the staff fraudulently met or exceeded the 95% threshold by checking hotel employees into a House Room, as well as by checking-in No-Shows and simply creating and checking-in fake reservations for other complimentary rooms.

65. Parker Palm Springs would then submit false occupancy reports to Starwood, fraudulently misrepresenting that the hotel's occupancy met or exceeded the 95% threshold and fraudulently misleading Starwood into believing that the Palm Springs Hotel was entitled to significantly greater reimbursement payments.

66. Like Parker NY, for each night on which occupancy was allegedly at or above 95%, Parker Palm Springs prepared an ADR Worksheet, which included, among other things, the alleged total number of rooms that were occupied in the hotel, the number of complimentary

NY02DOCS\1667347.17\C062189\0328633

rooms, the number of SPG rooms, the ADR to be used for the SPG reimbursement, and the percentage of occupancy for the hotel for that night.

67. For each night on which occupancy was allegedly at or above 95%, Parker Palm Springs also prepared a report known as the "Manager's Flash Report," which included, among other things, the back-up information supporting the ADR Worksheet.

68. Parker Palm Springs then faxed the ADR Worksheet and the Manager's Flash Report to the Starwood Hotels' SPG reimbursement team located in Ontario, Canada.

69. As a result, Starwood Hotels and Starwood International were fraudulently misled into causing PGI to pay or credit hundreds of thousands of dollars in reimbursements to which Parker Palm Springs was not entitled.

### *Starwood Discovers the Scheme*

70. Fortunately, the former General Manager of the NY Hotel confessed, to Starwood, the fraudulent scheme being carried out by Parker NY at the NY Hotel.

71. Starwood raised its concerns to Parker about possible fraud involving the SPG Program at the NY Hotel.

72. Starwood thereafter received an anonymous report concerning possible fraud at the Palm Springs Hotel. Counsel for Starwood advised counsel for Parker of the report concerning the Palm Springs Hotel.

73. After being alerted to the fraud by Starwood, Parker did not terminate Pipes' employment or that of the other managers still working at the NY Hotel and Palm Springs Hotel.

74. Starwood subsequently advised Parker that Parker had committed incurable breaches of the License Agreements and as a result, Starwood International had the right to terminate the License Agreements.

NY02DOCS\1667347.17\C062189\0328633

75. Upon information and belief, Parker contends that Starwood International does not have a right to terminate the License Agreements based upon the fraudulent scheme.

## AS AND FOR A FIRST CAUSE OF ACTION
### DECLARATORY JUDGMENT

76. Plaintiffs reallege the allegations of the preceding paragraphs as if fully set forth herein.

77. Parker NY's wrongful conduct constitutes a material breach of the NY Agreement and, as a result, Parker NY has defaulted under the NY Agreement.

78. Parker Palm Springs' wrongful conduct constitutes a material breach of the Palm Springs Agreement and, as a result, Parker Palm Springs has defaulted under the Palm Springs Agreement.

79. The nature and extent of Parker's wrongful conduct precludes any cure of the breach and default of the License Agreements.

80. As a result, Starwood International has the right to terminate the License Agreements.

81. Upon information and belief, Parker contests whether the License Agreements may be terminated as a result of Parker NY's and Parker Palm Springs' material breach and default under the License Agreements.

82. An actual case and controversy exists between Plaintiffs and Starwood International regarding whether (i) Parker NY has defaulted on its obligations under the NY Agreement and Parker Palm Springs has defaulted on its obligations under the Palm Springs Agreement; (ii) Parker NY can cure its default under the NY Agreement and Parker Palm Springs can cure its default under the Palm Springs Agreement; and (iii) Starwood International has the right to terminate the NY Agreement and the Palm Springs Agreement.

12

83. Starwood International, therefore, is entitled to a declaratory judgment that (i) Parker NY has defaulted on its obligations under the NY Agreement and Parker Palm Springs has defaulted on its obligations under the Palm Springs Agreement; (ii) Parker NY cannot cure its default under the NY Agreement and Parker Palm Springs cannot cure its default under the Palm Springs Agreement; and (iii) Starwood International has the right to terminate the NY Agreement and the Palm Springs Agreement.

## AS AND FOR A SECOND CAUSE OF ACTION
### BREACH OF CONTRACT

84. Plaintiffs reallege the allegations of the preceding paragraphs as if fully set forth herein.

85. Parker NY committed a material breach and default under the NY Agreement, by its actions and omissions described above.

86. Parker Palm Springs committed a material breach and default under the Palm Springs Agreement, by its actions and omissions described above.

87. As described above, PGI is a third party beneficiary and obligor under the NY Agreement and the Palm Springs Agreement in that it implements the payments under the SPG Program.

88. Starwood International and PGI are entitled to damages resulting from Parker's breach, in an amount to be proven at trial together with interest, default interest, and other costs and expenses.

## AS AND FOR A THIRD CAUSE OF ACTION
### FRAUD

89. Plaintiffs reallege the allegations of the preceding paragraphs as if fully set forth herein.

13

90. In furtherance of the scheme to defraud Starwood Hotels and PGI, Defendants created and forwarded to Starwood numerous documents containing false information.

91. Among other documents, Defendants created and forwarded to Starwood Hotels and, correspondingly PGI, reimbursement requests that contained false information.

92. At the time Defendants forwarded the false information, Defendants knew the information was false.

93. Defendants forwarded the false information to Starwood Hotels and PGI with the intent to mislead them.

94. Starwood Hotels and PGI relied on the false information provided by Defendants in paying Defendants hundreds of thousands of dollars to which Defendants were not entitled.

95. As a direct and proximate result of Defendants' fraudulent conduct, Starwood Hotels and PGI has been damaged in an amount to be proven at trial, together with interest, costs and expenses.

### AS AND FOR A FOURTH CAUSE OF ACTION
### UNJUST ENRICHMENT

96. Plaintiffs reallege the allegations of the preceding paragraphs as if fully set forth herein.

97. By their wrongful actions, Defendants have been unjustly enriched at the expense of Starwood Hotels and PGI.

98. Defendants should not be permitted to retain the benefits derived from their wrongful conduct.

99. As a direct and proximate result of Defendants' wrongful conduct, Starwood Hotels and PGI have been damaged in an amount to be proven at trial, together with interest, costs and expenses.

14

**WHEREFORE**, Plaintiffs demand the following relief:

(a) On the First Cause of Action, an order declaring that:

(i) Parker NY has defaulted on its obligations under the NY Agreement and Parker Palm Springs has defaulted on its obligations under the Palm Springs Agreement;

(ii) Parker NY cannot cure its default under the NY Agreement and Parker Palm Springs cannot cure its default under the Palm Springs Agreement; and

(iii) Starwood International has the right to terminate the NY Agreement and the Palm Springs Agreement.

(b) On the Second, Third and Fourth Causes of Action, an order granting judgment in favor of Starwood and against Defendants in an amount to be proven at trial plus interest, together with the costs and expenses incurred in uncovering and investigating Parker's wrongful conduct including attorneys' and consultants' fees;

(c) the costs and expenses incurred in this matter including attorneys' fees; and

(d) Such other and further relief as is just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury in this action of all issues so triable.

Dated:  January 2, 2013
        New York, New York

                                    BRYAN CAVE LLP

                                    By: _____
                                        Noah M. Weissman (NW 8592)
                                        Steven M. Stimell (SS 3467)

                                    1290 Avenue of the Americas
                                    New York, New York 10104
                                    (212) 541-2000
                                    NMWeissman@bryancave.com
                                    SMStimell@bryancave.com

                                    Attorneys for Plaintiffs